276 N.J. Super. 531 (1994)
648 A.2d 488
LAUTEK CORPORATION, AS ASSIGNOR TO LAMBDA FINANCIAL SERVICE CORP., PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
IMAGE BUSINESS SYSTEMS CORPORATION, DEFENDANT-RESPONDENT, CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 26, 1994.
Decided October 18, 1994.
*536 Before Judges J.H. COLEMAN, DREIER and WEFING.[1]
Miriam E. Cahn argued the cause for appellant, cross-respondent (Eichler, Forgosh, Gottilla & Rudnick, attorneys; Ms. Cahn, on the brief).
*537 David B. Zolotorofe argued the cause for respondent, cross-appellant (Goldman, Zolotorofe & Corcoran, attorneys; Mr. Zolotorofe, of counsel and on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiff, Lautek Corporation, by its assignee, Lambda Financial Service Corp., appeals from four aspects of a final judgment entered in its favor in the amount of $85,588.41 after a bench trial. Defendant, Image Business Systems Corporation (IBS), has cross-appealed from a discovery order entered by an earlier motion judge (not the eventual trial judge) and from the arithmetic calculation of the judgment entered by the trial judge. We remand for the entry of a modified increased judgment in favor of plaintiff and affirm on the issues raised in defendant's counterclaim.
Lautek supplied and serviced computer hardware and software manufactured by other companies, principally IBM. IBS assembled items from Lautek and various other vendors into computer products with imaging retrieval capabilities. The former president of IBS, David Sarna, initially dealt with Lautek because the former principal of Lautek was a close friend. After the friend left Lautek, Sarna continued to deal with Lautek whose remaining staff provided the same services. Although many companies could supply IBS with the IBM and other technology and warranty service, apparently Lautek did not require the return of the hardware to its offices. Rather it did on-site repairs and supplied loaner replacements if computers or other hardware had to be taken out of service rather than merely adjusted.
The business relationship was an unusual one in that although the companies did two to three million dollars business each year, there were no written contracts. Orders were placed and revised and complaints adjusted by telephone. Practically the only written communications between the companies were billing invoices and payments. IBS assured itself of Lautek's services by constantly *538 remaining approximately ten percent behind in its payments, so that at any one time $200,000 or more was owed by IBS to Lautek. IBS determined that by this practice it could insure that Lautek would address any problems that arose concerning the products it had sold.
In the fall of 1989, Lautek was experiencing financial difficulties and began laying off some employees. IBS also was experiencing cash flow problems, and some friction developed between the companies concerning Lautek's understanding that IBS would pay its outstanding bills to Lautek. Since IBS was beginning to be dissatisfied with the servicing of the products due to Lautek's personnel reductions, IBS commenced purchasing products elsewhere and refused to pay invoices even beyond the usual hold-back period that had developed in the parties' relationship. Lautek finally demanded $280,307.74, but IBS sent a check for merely $51,224.83. The invoices referred to on the payment check reconciled with very few of the items for which IBS was billed.
Lautek started suit in December 1989 for the then-claimed balance due of $235,597.29. In early 1990, Lautek filed for reorganization in the bankruptcy court, and IBS removed the Superior Court action to the Bankruptcy Court. The bankruptcy judge, however, permitted the action to proceed in the Superior Court through Lambda Financial Service Corp. as assignee, with the bankruptcy court retaining ultimate jurisdiction. In the summer of 1990, the reorganization proceeding was converted to a Chapter 7 straight bankruptcy.
Difficulties with discovery in this case is a basis for the cross-appeal and also affects plaintiff's claims of the mistaken admission and use of evidence at trial. We, therefore, will discuss the discovery in some detail.
Lautek initially served IBS with interrogatories and document requests. IBS responded on January 8, 1991 and amended its response on March 28, 1991. On August 23, 1991, the first motion judge granted Lautek's motion to compel defendant to provide more specific answers to interrogatories. IBS submitted a second *539 amended response to plaintiff's interrogatories on October 9, 1991. On January 27, 1992, the court granted Lautek's motion to compel the deposition of an IBS representative, William Kirshner, who had signed the interrogatory answers, after Lautek had requested the deposition since June 5, 1991. Lautek requested additional documents from IBS on February 1, 1992 and served notice to compel the deposition of IBS's former president, David Sarna, on March 6, 1992, after being informed that he possessed the relevant information.
Following a three-month lapse in the case while settlement was pursued in the bankruptcy court, Lautek deposed Mr. Sarna in February 1993. He admitted that IBS had failed to produce relevant documents for a few years. Finally on March 16, 1993, after some additional documents were supplied after the first deposition of David Sarna, Lautek moved to foreclose consideration of these documents and to bar further production of IBS's documents. A second motion judge heard the motion to preclude admission of further documents from the defense. The judge acknowledged that the defense presented the new documents after the March 11, 1993 initial trial date, and had failed to give the plaintiff adequate opportunity to examine the documents. However, the judge permitted the introduction of the documents submitted on March 16, 1993, provided that the defense paid for an additional deposition of Mr. Sarna by Lautek. No further documents were permitted from IBS.
The remarks of the motion judge are telling. He first notes the long history of demands for documents by plaintiff and the production of documents by defendant in 1990 and 1991. The judge recognized that after the deposition of Mr. Sarna, when he could have been questioned concerning the documents, and on the eve of trial, defendant produced additional documents. Relating to the deposition, the judge stated:
The documents that are now presented to the plaintiff were not presented at that time, so they had no opportunity to cross-examine the former president as to how they relate to the case. Those documents don't surface until after the trial date of *540 March 11th. And it indicates here that there was subsequent oral [communication] and correspondence with defense counsel regarding discovery.
There are allegations of lost profits by the defense. Frankly, I tend to agree with the plaintiff in this case, that ... discovery ... should have been over two and [a] half years ago, but it's still flying about. The  well, let's say that the course of conduct by the defense [in] this case is not commendable. The discovery should have been handed over long before this stage.
The judge realized that plaintiff was put "at a severe disadvantage" by defendant coming "to court with a package of discovery that should have been handed over two and a half years ago and expect[ing plaintiff] to litigate [with] those papers." The judge stated clearly "there will be no further documents admitted." This provision was carried into his order of March 26, 1992.[2]
This matter came to trial before still a different judge and was heard on June 9 and 10 and July 6 and 7, 1993. At the trial, additional documents that should have been produced in discovery were offered in evidence by defendant. The trial judge, aware of the prior discovery order, denied admission to some of the documents, admitted others, and permitted some to be used to refresh Mr. Sarna's recollection on the witness stand. The documents offered were both additional invoices and agreements which were substantive evidence of defendant's various counterclaims. Since, however, the trial judge disallowed all but three of these counterclaims, we will analyze only the matters that affected the final judgment.
*541 Plaintiff claims two errors in admission of documents, an allegedly unwarranted personnel expense, and an error relating to the disallowance of prejudgment interest. First, Lautek claims that it should not have been charged with a $30,168.50 offset for late delivery or servicing problems on the First National Bank of Chicago's conversion to IBS's imaging system. The amount allegedly lost by IBS was actually approximately double this amount, but the trial judge awarded one-half of the loss as Mr. Sarna admitted that other vendors and IBS's own problems occasioned at least some of the loss. The percentages, however, were never quantified. Second, the judge awarded IBS a $40,000 credit for Lautek's alleged failure to ship certain memory boards to the State Board of Insurance of Texas. Third, Mr. Sarna testified that IBS was required to retain in-house servicing personnel to make up for the failure of Lautek's personnel to service customer products in accordance with its prior practices. He quantified the amounts spent at $90,000, $60,000 of which was allowed by the court. Finally, the trial judge determined that under the circumstances of this case there was no reason to award prejudgment interest.
We approach the analysis of each of these four claims with the understanding that in our review of the results of a bench trial the factual findings of the trial judge, his assessments of credibility, and the discretionary decisions he may have made are entitled to great deference. See Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). If, however, we are certain from the record that findings were undoubtably mistaken, we may "appraise the record as if we were deciding the matter at inception and make our own findings and conclusions." Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338, 382 A.2d 933 (App.Div.), aff'd o.b., 78 N.J. 320, 394 A.2d 360 (1978).
Initially, we note that some of the disputed documents were used in cross-examination of plaintiff's principal witness, Mr. Alvarez. As plaintiff's total affirmative claims were allowed by the court, subject only to the two offsets, the charge for service *542 personnel, and the denial of interest noted earlier, the use of the documents in cross-examination was harmless error.[3]

I
We will first discuss defendant's claim for a $60,336.56 offset based upon a penalty defendant was required to pay to the First National Bank of Chicago. Defendant's offset claim was based solely on the testimony of Mr. Sarna. He testified that during his tenure at IBS, the company provided the bank with a base system and then converted its records to the new system. Unfortunately, the system was not made operative in a timely manner, and this was highly embarrassing to IBS.
The embarrassment stemmed from a variety of reasons. The CEO of the bank was related to IBM's representative on the IBS Board of Directors, and the problems at the bank were therefore immediately made known to the IBS board. In addition, the system was being installed over a summer, and several of the children of the bank's executives were given summer jobs to perform the conversion. The late delivery and malfunctions prevented their performing their jobs, and again, the feedback to the executives was immediate.
The contract with First Chicago provided for deadlines with financial penalties. Mr. Sarna testified:

*543 I am claiming that they [Lautek] are responsible, although I must say in fairness that they don't have total responsibility, but they definitely were a large contributor to the problems that they [the bank] had, particularly with this base system, which from our point of view was very simple, and as I mentioned prevented them from doing their conversion.
To that point in Mr. Sarna's testimony he had not quantified either the loss to IBS, or the percentage allegedly attributable to defendant. The eventual settlement of the matter with the bank was concluded well after Mr. Sarna left the company. He was, nevertheless, shown a letter agreement dated August 26, 1991 from IBS to Lisa Palmleaf, a Vice President of the First National Bank of Chicago, and purportedly agreed to by her on October 1, 1991. This letter purports to be, inter alia, the settlement of a claim based upon the late installation of the computer system. In paragraph two, it states:
Due to late delivery of contracted system, Image Business Systems (IBS) agrees to deduct $60,336.56 (Cost of New IBM RISC System 60,000) from the outstanding balance of $184,000 for a remaining adjusted balance due IBS of $123,664.56. This will satisfy all contractual penalties.
Prior to reading this letter which was given to Mr. Sarna to refresh his recollection, he had not indicated that he remembered the amount of the penalties other than they were substantial, and that plaintiff was a "large contributor" to the delay. The lack of an independent basis for Mr. Sarna's testimony is clearly shown when he stated that, although he had signed the original contract with the bank, "they had deducted from the amounts due as a penalty under the penalty provision that was in the original contract. That's what this  this letter says. And so everything I know in my discussion with the company, because I  I do talk to my ." The judge then overruled plaintiff's objection to this testimony as hearsay, because Mr. Sarna had originally entered into the contract with the bank. In such an instance, the judge stated, "How can it be hearsay?"[4] Plaintiff's counsel pressed the *544 objection and noted that Mr. Sarna was not with IBS at the time of the penalty and any discussions would therefore be hearsay, but her objections were mistakenly overruled. The record also shows the following cross-examination of Mr. Sarna:
[Question] Do you know for a fact personally that the penalty was actually assessed?
[Answer] You mean beyond what it says in this document?
[Question] I am not talking about what it says in the document, I want to know your personal knowledge.
[Answer] All I know is that the client told me that they were going to assess the penalty and  and I don't have any information that they changed their mind.
The document was later admitted into evidence, again over the hearsay objection of plaintiff that the document had not been properly authenticated as required by the Rules of Evidence. The trial judge at that point mistakenly recalled Mr. Sarna's earlier testimony. The judge correctly stated that Mr. Sarna was aware of the circumstances surrounding the transaction but then stated that "[h]e was aware of the letter, he was aware of the penalty that was incurred, he described it in his testimony, he knew that the material was supplied late when he left, and he gave me the precise figure in his testimony of $60,336.50 by way of penalty." What the judge had forgotten is that Mr. Sarna only gave this information after he had read the letter, and the use of such corroborative testimony to bootstrap the admission of the letter certainly could not be based upon the contents of the letter itself. The letter was inadmissible without a better foundation. Such a foundation most probably would have been easy to supply, but it was absent in this case.
*545 Could the letter properly have been used to refresh Mr. Sarna's recollection? The use of the letter merely to refresh the witness' recollection would have been proper, if it was shown that the witness had prior knowledge that could be refreshed by the information. N.J.R.E. 612 provides that if a writing is used to refresh recollection, it must, as here, be produced at the hearing. Prior case law provides that the "admissible evidence is the recollection of the witness, and not the extrinsic paper." State v. Carter, 91 N.J. 86, 123, 449 A.2d 1280 (1982). While Mr. Sarna knew that there was some difficulty with the bank installation and a later penalty, there is no indication that, prior to his reading the letter, he had any knowledge of the amount of the penalty, had forgotten the amount, and that his recollection could be refreshed, if he saw the letter agreement.
It is true that in the words of Judge Hand in United States v. Rappy, 157 F.2d 964, 967 (2nd Cir.1947), cert. denied, 329 U.S. 806, 67 S.Ct. 501, 91 L.Ed. 688 (1947), "[a]nything may in fact revive a memory: a song, a scent, a photograph, an illusion, even a past statement known to be false."[5] The problem here is not with the song or the scent, but rather with a writing that relates the event or supplies the information. The witness must state that it is not being relied upon, because his current memory has been refreshed. But, even after such alleged refreshing of the memory, the adversary still may argue that the document has, in fact, supplied or supplanted whatever independent recollection may have previously existed. Judge Hand considered this problem in United States v. Rappy and stated that when a witness declares that his memory has been refreshed,

*546 the opposite party may show, either that it has not evoked what appears to the witness as a memory, or that, although it may so appear to him, the memory is a phantom and not a reliable record of its contents.... [T]he evoked memory cannot be a truthful record when it tracks a statement shown to be false.
[157 F.2d at 967-968].
In this case, the problem is not that the statement was shown to be false, but that the statement was shown to be one of which the witness had demonstrated no prior knowledge. A witness may not merely parrot a statement used to refresh recollection, thus making admissible a portion of a document that itself may be inadmissible.
We determine that the admission of the letter agreement, D-14, was in error, since no proper foundation had been laid under Evid.R. 803(c)(6). The use of the documents to refresh Mr. Sarna's recollection was likewise in error, since no testimony had been given that he knew of the amount of the penalty but had forgotten it, and the document merely refreshed this recollection.
Additionally, the trial judge, after hearing the varying factors that gave rise to the penalty, arbitrarily assessed fifty percent of the penalty against plaintiff. While plaintiff may very well have been responsible for some portion of defendant's loss, the trial judge was given no basis upon which to arbitrarily affix fifty percent responsibility.
Based upon all of the above factors we vacate the First National Bank of Chicago offset.

II
The next issue in this case involves the offset taken by defendant for $40,000 as compensation for allegedly having to pay twice for memory boards shipped to the State Board of Insurance of Texas. Plaintiff initially objected to Mr. Sarna's testimony concerning the claim of problems by the Texas authorities, since these claims were hearsay. The trial judge correctly ruled that the witness could describe what he was required to do after being contacted by the Texas State Board of Insurance and that the *547 Texas complaints would not be received for the truthfulness of their contents.
Mr. Sarna explained that IBS had received a bill from Lautek itemizing shipments made directly to the State of Texas, and that thereafter Mr. Sarna received a call from the Texas State Commissioner of Insurance, as a result of which IBS authorized an additional shipment of memory boards without which IBS would not be paid $700,000 or $800,000 due on its contract. Mr. Sarna could not remember the number of memory boards stating
its either 40 or 80. I don't recall. I mean there were forty systems, I believe. And I must tell you that my memory is definitely hazy on this subject. But to the best of my recollection there were 40 individual work stations. There were either one or two boards in each processor. But altogether, you know, we are talking about something that would fit in the size of two lunch boxes. It just happens to be very expensive.
Defense counsel then proceeded to refresh Mr. Sarna's recollection with two exhibits that had never been supplied to plaintiff in discovery, claiming that this use of the exhibits did not violate the final discovery order prohibiting defendant "from producing any further documents either in support of its counterclaim or in defense of the complaint in the above captioned matter." These documents were vital. They were the first and only documents that quantified defendant's claim for the Texas State Board of Insurance offset.
The trial judge stated that he would permit the witness to use the documents to refresh his recollection. As soon as the witness saw the documents, he stated that IBS had supplied forty-one processors with eighty-two memory kits, that they had been billed for these kits by plaintiff even though they had not been received in Texas, and that the cost of replacing these kits was "about 40," presumably meaning approximately $40,000, the amount awarded to defendant for this item.
All of this testimony was objected to by plaintiff as "unfair, fundamentally unfair" under the rules governing discovery. Plaintiff reiterated to the court that defendant had represented that all documents had been provided, and that after many motions, the *548 order of preclusion was entered. Mr. Sarna was twice deposed, and aside from the bare allegation of damages and the answers to interrogatories, no documentary foundation was laid for this $40,000 charge which Mr. Sarna could not himself verify until he examined the invoices and checks that had been withheld from plaintiff.[6] While the judge excluded the documents from evidence, he allowed Mr. Sarna's $40,000 claim to stand, supported only by his examination of the document.
There is a subtle difference here between the documents without foundation used to refresh Mr. Sarna's recollection concerning the Chicago Bank claim and the documents used to refresh his recollection concerning the Texas Board of Insurance claim. These latter documents, had they been supplied in discovery, could properly have been used to refresh Mr. Sarna's recollection, since it appears that he was familiar with the transaction at the time. However, in all good conscience the court should not have permitted their use in any form and should have stricken Mr. Sarna's estimate. Defendant's use of the documents did nothing more than "sandbag" plaintiff.
On cross-examination it became even clearer that Mr. Sarna could not have testified to the amount of the Texas claim without the prohibited exhibits. Mr. Sarna was asked whether there had been a dispute concerning the Texas bills. He replied that there were disputes but did not know whether there was any documentation. He knew that Lautek "was going to try and claim it from UPS and that they were going to make us whole." He stated that plaintiff agreed that it owed defendant the $40,000 and that plaintiff would make it up. When asked where he got the $40,000 figure, he stated, "[i]t is the best of my recollection sitting here today." He was then shown his affidavit signed January 31, *549 1992 where he stated that IBS was improperly billed "over $25,000" for the same items. He explained that that was the best of his recollection at that time, and now that he had seen the invoices, he could state that it was $40,000.
This makes it clear that had the invoices not been shown to him, he could have stated a value of no more than $25,000, if that. When asked whether Lautek ever made good on crediting IBS after looking to United Parcel Service for reimbursement, he first stated that he could not answer the question, but then stated that he was positive that such payment was not made. But he also testified that he did not review the records of IBS, he was certain there was no restitution while he was president of IBS, and he had been informed by IBS that there was no subsequent one. Plaintiff noted to no avail the hearsay aspect of the answer.
When the answers based upon the late-produced documentation are redacted from this testimony, defendant's proof was insufficient to sustain the offset for the Texas Department of Insurance memory boards. We reiterate that had there been proper disclosure of the invoices and checks, Mr. Sarna's refreshed recollection would have been competent and, therefore, subject to the trial judge's positive credibility findings concerning his testimony. The improper withholding of this documentation and use to refresh the witness' recollection should have caused the trial judge to strike the testimony concerning valuation.

III
The next claim concerns the personnel hired to service the computers sold by plaintiff. Here again, the judge accepted Mr. Sarna's testimony that Lautek had agreed to provide on-site serving and temporary replacement of equipment as needed while servicing was in progress. Other vendors did not supply this service, and, therefore, IBS was required to hire personnel to do so.
The initial claim was for four employees, but it was then shown that when NYNEX replaced Lautek as defendant's principal *550 supplier with similar servicing, three of the four new employees were retained. The claim for service, therefore, was dropped to the cost of a single employee initially placed at $90,000 and then explained to be $60,000 plus overhead. There was no back-up data presented, and the testimony vacillated. Mr. Sarna stated "[A]s I mentioned, we had to hire an additional technician and keep more sparing and, you know, incur additional costs ourselves. And I think that I tried to quantify that as best I could at about $90,000." On recross-examination he stated:
[Question]: Now Mr. Sarna when you just testified that you believe that the repair issue cost IBS $90,000, you can't say that with any reasonable degree of certainty, can you?
[Answer]: I think I could say with a fair degree of certainty because I know what the cost of the service technician was directly, which was in the vicinity of $60,000 a year, and I know what the cost of additional expenses associated with the technician are in terms of his car expenses and travel expenses and so on, and I have some idea what we paid for sparings. So I would say that's a pretty conservative estimate.
He then restated that he had no records. The trial judge allowed $60,000 for this item.
This issue resolved to one of credibility, and the trial judge determined it in favor of defendant for $60,000 of its $90,000 claim. We have no cause to overturn this decision. Rova Farms Resort v. Investors Insurance Co., supra, 65 N.J. at 484, 323 A.2d 495.

IV
Plaintiff's last claim relates to the court's denial of prejudgment interest. Nowhere in this case did defendant deny that it had withheld payments from plaintiff, and that this was its practice over the years. Defendant acknowledged having a cash flow problem, which we can assume would have been exacerbated had it paid plaintiff approximately $200,000 that was owed. Had it done so, there is no question that it would have been forced to resort to credit to resolve its cash-flow problems. It saved this expense by withholding plaintiff's money. The concomitant cash pressures on plaintiff's side forced it not only to borrow money, witness the various creditors in the bankruptcy proceeding, but its *551 problems with defendant and others forced the company first to seek reorganization and then to go into liquidation. Defendant, having been spared the cost of paying interest on the money that it rightfully owed plaintiff should now pay this sum; plaintiff, having been deprived of the payment and having to therefore pay interest elsewhere, should receive interest. Equity demands that in a situation such as this interest be paid. See A.J. Tenwood Assocs. v. Orange Senior Citizen Housing Co., 200 N.J. Super. 515, 525-527, 491 A.2d 1280 (App.Div.), certif. denied, 101 N.J. 325, 501 A.2d 976 (1985).
In a case where the claims are for a liquidated sum, prejudgment interest is regarded as compensatory. Rova Farms Resort v. Investors Ins. Co., supra, 65 N.J. at 506, 323 A.2d 495. The interest awarded does nothing more than cover "the value of the sum awarded for the prejudgment period during which the defendant had the benefit of the monies to which the plaintiff is found to have been earlier entitled." Ibid. However, we recognize that the awarding of prejudgment interest is subject to the discretion of a trial court in accordance with the principles of equity. Manning Eng'g, Inc. v. Hudson County Park Comm'n, 71 N.J. 145, 159-160, 364 A.2d 1 (1976), vacated o.g., 74 N.J. 113, 376 A.2d 1194 (1977). On the amount of the judgment originally entered by the trial judge, we have no question that prejudgment interest should have been awarded, applying the standards of Rova Farms Resort v. Investors Ins. Co., just cited.
The two offset claims which we have restored to plaintiff stand on a slightly different footing. The Chicago Bank claim was unliquidated in that, absent the hearsay problem, only the percentage of the claim that could be charged against plaintiff was unresolved. Also, if defendant had made proper disclosure of its documentary evidence, there would have been an offset for the Texas State Insurance Department item. In these two areas there at least would have been some basis for the trial judge to have exercised his discretion in denying prejudgment interest. Since he did so for the entire claim, we can readily assume that he *552 would have denied interest for these two disputed claims, even had he realized that defendant legally had not proven its right to an offset. Giving deference to this interest decision of the trial judge, we amend the judgment to add interest solely for the $85,588.41 initially awarded.

V
We have earlier noted that defendant's cross-appeal concerning the motion judge's entry of an order limiting discovery and denying defendant's motion to amend its counterclaim has no merit. We therefore pass to defendant's second issue. It claims that the trial judge erroneously calculated the judgment entered against IBS. Plaintiff's original demand against defendant was for $222,335.40. The trial judge, however, used the initial bills submitted to defendant of $280,370.74 from which he deducted the offsets to the Bank of Chicago, the Texas Insurance claim and the servicing claim. There was also an unapplied credit invoice which does not seem to be the subject of any dispute. Defendant's characterization of the numbers used by the court was incorrect. The court corrected the original demand and instead used what the evidence showed to be the balance owed by defendant to plaintiff before the various credits. This was a factual decision which we will not disturb.
In sum, we direct that the judgment be modified to add back the deductions of $30,168.50 and $40,000, and that prejudgment interest be granted on the original amount awarded by the court. The matter is remanded to Law Division for the entry of the appropriate amended judgment.
NOTES
[1] Judge Wefing did not originally participate in this case, but has, with the consent of counsel, been added to the panel deciding the matter.
[2] The motion judge also determined that defendant would not be permitted to amend its counterclaim to add additional defendants. Lautek's assignee, as a secured creditor, refused to approve the settlement in the bankruptcy court, and other secured creditors agreed. Defendant wished to add all of these creditors as additional defendants in this case because of breach of an alleged settlement agreement. The trial judge determined that to amend the complaint at the eve of trial to include this claim "would only complicate further the present suit" and would "unduly delay the process of the '89 complaint, if the Court allowed these third parties to come in. This is a separate claim of breach [of] contract on a settlement that arose later and tortious interference with that can be pursued separately."

This portion of the motion judge's order is one of the bases for defendant's cross-appeal. We affirm the motion judge's decision on this point substantially for the reasons expressed in his oral opinion of March 26, 1993.
[3] As this trial spanned the former and present New Jersey Rules of Evidence, effective July 1, 1993, the old and new evidence rules govern different rulings of the trial court. Since the substantive rules applicable to this case did not change in material respect, we will refer solely to the 1993 Rules of Evidence. N.J.R.E. 607 permitted the introduction of extrinsic evidence relevant to the issue of credibility. However, the evidence used to cross-examine Mr. Alvarez must still have been not only admissible under the Rules of Evidence, but also not barred for use at trial by some other statute or rule. Our discussion of the improper use of barred documentation with respect to the Chicago Bank and Texas Insurance Department claims would also have applied to defendant's challenge to plaintiff's substantive claims had the court not found in favor of plaintiff on these claims. We are mindful, however, of the fact that the use of these documents in cross-examination may also have affected the court's view of credibility, which issue was decided in favor of defendant.
[4] Hearsay exceptions might have applied; if proper foundation had been laid. The letter had not been authenticated by any representative of IBS as a business record under N.J.R.E. 803(c)(6). Mr. Sarna did not know the account executive who had signed the letter, nor the bank vice president who accepted the terms on behalf of the bank. Plaintiff's attorney specifically objected that there had been no foundation from Mr. Sarna or any other witness that the letter "was kept in the ordinary course of business," or that it satisfied the other requirements of N.J.R.E. 803(c)(6), necessary prerequisites to introduction under that hearsay exception. Since it compromised the bank's much larger claim, it also might have been admitted as a statement contrary to the bank's pecuniary interests. N.J.R.E. 803(c)(25). The letter, if properly authenticated, might also have been admissible as a "verbal act" of the bank, i.e., the acceptance of a contract.
[5] Actually this is a paraphrase of an equivalent statement by Judge Dietrich in Jewett v. United States, 15 F.2d 955, 956 (9th Cir.1926): "[I]t is quite immaterial by what means the memory is quickened; it may be a song, or a face, or a newspaper item, or a writing of some character. It is sufficient that by some mental operation, however mysterious, the memory is stimulated to recall the event, for when set in motion it functions quite independently of the actuating cause."
[6] Plaintiff's attorney reiterated that in her interrogatories she had asked "If IBS maintains that it has been damaged by the acts of Lautek, set forth the amount of all such damages alleged with the method of computation thereof, attaching all pertinent documents." Nothing had been received until these documents appeared at trial.