799 A.2d 541

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ALAN SEGARS, DEFENDANT–APPELLANT.

Argued March 12, 2002—Decided June 26, 2002.

482

*Alan Dexter Bowman,* argued the cause for appellant.

*Annmarie Cozzi,* Assistant Prosecutor, argued the cause for respondent (*William H. Schmidt,* Bergen County Prosecutor, attorney).

PER CURIAM.

On February 15, 1999, Ridgewood Police Officer Douglas Williams issued defendant, Alan Segars, a summons for operating a motor vehicle with a suspended license. Throughout the proceedings below, Segars, an African–American, maintained that Officer Williams checked his license plates on a Mobile Data Terminal (MDT) because of his race. All parties agree that if that was the case, his action would have been impermissible. The issue presented is narrower: Should the trial court's conclusion that Segars failed to sustain the burden of proving discriminatory targeting be sustained? Under the unusual facts of this case, we think it should not.

I

Segars was charged in Ridgewood Municipal Court with driving with a suspended license, contrary to *N.J.S.A.* 39:3–40. He subsequently filed a motion to suppress the evidence against him. Before the hearing, he moved for discovery of Officer Williams's personnel file, the Ridgewood Police Department's procedures for use of the MDT, and any reports regarding Officer Williams's use of the MDT on February 15, 1999.

The motion to compel discovery proceeded first. The facts were sharply contested; the parties offered radically different versions of the event. Segars testified that on the date in question, at

approximately 1:00 p.m., he drove his car into the parking lot of the Bank of New York in Ridgewood. He parked next to an unoccupied police car, which was the only other car in the lot at the time, and entered the bank to use the automated teller machine. On the way in, he passed Officer Williams, who is Caucasian, exiting the bank. Segars "noticed that [Officer Williams] sort of was looking with sort of a question mark on his face. As I was getting ready to use the machine, he was sort of looking back." Segars was wearing a running outfit and a baseball cap. By the time he returned to his car after using the automated teller machine, Officer Williams's car was blocking the exit lane. Segars exited the parking lot through the teller's lane and drove next door to the Quick Stop. After a few minutes in the Quick Stop, Segars returned to his car where he was approached by Officer Williams, who asked to see his credentials. Segars produced them and, when asked, admitted that his license had been suspended.

According to Segars, before issuing him a ticket Officer Williams went to another car parked on the street in front of the bank and talked to its occupant. Another police officer arrived and issued a ticket to the occupant of that car, who was Caucasian, while Officer Williams issued a ticket to Segars. Officer Williams offered Segars a ride home, which he accepted. Segars testified that Officer Williams was polite and made no comments in respect of race.

Contrariwise, Officer Williams testified that he recalled that Segars's unoccupied car already was in the bank parking lot when he drove in. He decided to check the license plates on his MDT, and may have checked the plates on another car that was parked in the bank lot at the same time. The check of Segars's plate revealed that the registered owner of the vehicle had a suspended driver's license. Officer Williams said he then pulled up next to the parking lot exit and called central dispatch to determine the reason for the suspension, which he discovered was for driving while impaired. While waiting for Segars to return to his car,

Officer Williams checked the plates on another car that pulled up in front of the bank because he noticed that it had an expired inspection sticker. He saw the driver of that car use the automated teller machine. That driver, who was the Caucasian mentioned in Segars's testimony, subsequently was issued a ticket. From the point that Segars left the bank, his version of the events coincides with Officer Williams's testimony.

On cross-examination, Officer Williams restated that he did not use the automated teller machine within the span of time in question, although he may have used it at 8:00 a.m., and that he never saw Segars in the bank or anywhere else prior to the MDT check. When asked why he "ran" Segars's plate, Officer Williams replied, "It was a bank holiday ... very light traffic, very—not many cars parked in the lot. There were two cars parked there; I ran both plates.... [A]ny car that was in the lot I would have run." Officer Williams stated that he knew that the driver of the car parked in front of the bank was using the automated teller machine but that did not affect his decision to run those plates. He stated that he runs plates frequently, without "rhyme or reason," and that if it is a slow day, like a holiday, he might check every car that goes by.

At the end of the first day of testimony, the Municipal Court denied Segars's discovery motion regarding Officer Williams's personnel file and motor vehicle stops (other than the two pages that he had received already from the State), but granted his request for a copy of the Ridgewood Police Department's MDT policy and procedures. In making its ruling, the court assumed that Segars's account was true and that Officer Williams had seen him in the bank prior to running his plates, but reasoned:

> I haven't heard anything that persuades this Court that Officer Williams ran Mr. Segars MDT—on the MDT just because he was African–American. There were three apparent runnings just within a very short time of each other, and apparently at least one of which was a Caucasian person.... [H]e runs vehicles all of the time, even at random.... The fact that Mr. Segars is African–American alone is not enough, even accepting that the officer knew that he was African–American.

The court stated that it was more likely that Segars was correct regarding the chronology because it is understandable that he would remember the event better.

On the second day of trial, Segars presented the records of the Bank of New York regarding automated teller machine usage on the day in question. Those records supported the accuracy of Segars's testimony where it conflicted with that of Officer Williams. In particular, they bolstered Segars's assertion that he and Officer Williams first encountered each other in the bank, and that the officer only then ran the MDT check on Segars's license plate. The records showed that Officer Williams used the automated teller machine at 1:10 p.m. and Segars used it at 1:11 p.m. Concomitantly, police records revealed that Officer Williams checked the plates on another car at 1:12 p.m., on Segars's at 1:13 p.m., and on a third at 1:16 p.m.

The court denied Segars's motion to suppress. Confronted with Officer Williams's bank records, the court held that his testimony that he had not known Segars was African–American prior to checking his plates was not believable, but noted that even before being presented with the records it believed that Segars's testimony was probably more accurate. The court expressed the view that Officer Williams simply had forgotten the facts of the stop, which had occurred six months before, or that Officer Williams denied using the automated teller machine because he was not supposed to perform personal errands while on duty. The court concluded that given all the facts of the case, including that Officer Williams ran the plates of two other cars at the time he ran Segars's, he was "satisfied that [Officer Williams] used the MDT in this case for other than racial purposes."

Segars pled guilty to driving with a suspended license and was sentenced. The plea was conditioned on his right to appeal the denial of the motion to suppress. On his appeal *de novo* on the record before the Superior Court, Law Division, Segars again was convicted and the same sentence was imposed. In ruling, the Superior Court held that under *State v. Locurto,* 157 *N.J.* 463,

470–71, 724 A.2d 234 (1999), "great deference" should be given to "the findings of" the trial court because he has an option to hear and see the witnesses and to have a feel for the case "and that the role to be taken by this court in reviewing a municipal court is to determine whether the findings made by the lower court could reasonably have been reached upon sufficient credible evidence presented in the record." Reviewing the record, the court stated:

> There was nothing supplied to [the Municipal Court] indicating that this officer issued this ticket for any racially motivated reason as claimed by the defendant.... [T]here was ... no proof submitted to this court other than the fact that the officer was mistaken in his testimony as to using the [automated teller] machine and the fact that he probably did see the defendant. [The court] went through all that and found credible that the officer made a random check.... The municipal court found that the officer's testimony was credible and such should be considered in the case at bar. The fact that the officer may or may not have noticed the defendant when walking from the [automated teller] machine is not sufficient to determine that the officer was conducting the MDT test in a racially biased manner.

Segars appealed to the Appellate Division. Like the Law Division, the court held that it was not "in a good position to judge credibility and should not make new credibility findings," citing *Locurto, supra,* 157 *N.J.* at 470–71, 724 *A.2d* 234, and *State v. Barone,* 147 *N.J.* 599, 615, 689 *A.2d* 132 (1997), to the effect that an appellate court may not "weigh the evidence," assess the credibility of the witnesses, or make conclusions about the evidence. Hence, its standard for review was "whether there is sufficient credible evidence present in the record to uphold the findings of the Law Division," citing *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.2d* 809 (1964). The Appellate Division concluded that the finding that Officer Williams conducted an MDT check of Segars's license plates for valid reasons was supported by the record:

> There is no evidence, only argument by defense counsel, to support the proposition that the motivation for Officer Williams' use of the MDT was that he knew that defendant was African–American. There is no proof outside the in-court record that leads to the conclusion either.

One judge dissented, arguing that this was the "exceptional" case "which requires that we not uphold the municipal court's factually unsupported suggestion for Officer Williams' lack of credibility ... or the Law Division's deference on trial *de novo.*"

Although "[t]he officer's conduct may have been appropriate and properly motivated, ... his answers to too many questions suggest he did not merely forget he entered the bank that day." The dissent concluded that "where the only State witness is so clearly lacking in credibility, and the lack of credibility related to the events leading up to the MDT check, the New Jersey judiciary cannot rely on the technical rules of appellate jurisprudence to sustain the conviction."

This case is before us as of right under *Rule* 2:2–1(a) as a result of the dissent.

## II

Segars argues that there can be only one explanation for Officer Williams's inaccurate testimony, namely, that he was covering up for having checked Segars's plates because of his race. He characterizes the Municipal Court's ruling as deficient because it did not examine the broad implications of Officer Williams's inaccurate testimony. In turn, Segars claims that the Law Division decision "relie[d] upon the municipal court's clearly flawed credibility findings" and thus is "facially specious." The Appellate Division, according to Segars, "made no reference to the weight which should be accorded to the clearly inaccurate and material testimony of the officer." Segars also contends that although an MDT check may be random under *State v. Donis*, 157 *N.J.* 44, 723 *A.*2d 35 (1998), to be valid it requires objective, "pre-determined selection criteria," and that was lacking here.

The State counters that the reason for Officer Williams's inaccurate testimony is unknown, and that Segars's theory is "only rank speculation and conjecture." According to the State, the explanation simply might be the passage of six months between the stop and the hearing, or as the Municipal Court conjectured, the officer's refusal to admit that he had been conducting a personal errand. Regarding the credibility of Officer Williams's rationale for checking Segars's plates, which did not include any reference to his race, the State points out that the "false in one, false in all" inference is not mandatory. The current record, the State posits,

contains no evidence to support an inference of racial targeting. Moreover, even if Officer Williams's testimony raised such an inference, the record as a whole rebuts it because it reveals that Officer Williams's checked the plates of both vehicles that he saw in the parking lot, and that a Caucasian individual was treated similarly to Segars.

Further, regarding the trial courts' findings, the State observes that both courts addressed the impact of the bank records and that the Appellate Division, in turn, "appropriately deferred to the factual findings of the lower courts." Finally, the State urges that the random use of the MDT, authorized in *Donis, supra,* does not require pre-determined selection criteria.

### III

■ We have held that because MDT checks are not traditional searches subject to Fourth Amendment restrictions, they can be "random," that is, not based on reasonable suspicion, and thus need not be governed by predetermined objective criteria. *Donis, supra,* 157 *N.J.* at 48, 54–55, 723 *A.*2d 35. However, MDT checks must not be based on impermissible motives such as race. *Cf. State v. Maryland,* 167 *N.J.* 471, 484, 771 *A.*2d 1220 (2001) (holding that although field inquiry does not require reasonable suspicion it cannot be based on race or other impermissible criteria).

In *State v. Myrick,* 282 *N.J.Super.* 285, 659 *A.*2d 976 (Law Div.1995), the court upheld an MDT check initiated for no particular reason by a police officer on the car driving ahead of him. The court reasoned that the check was not a search for constitutional purposes because a "scan of a computer bank, in order to obtain information relevant to the license number" does not intrude on any legitimate privacy interest. *Id.* at 294, 659 *A.*2d 976 (quoting *State v. Bates,* 1987 *WL* 15817, *1 (Ohio App.1987)); *see also State v. Bjerke,* 697 *A.2d* 1069, 1073 (R.I.1997) (holding that computer check of defendant's license plates was not Fourth Amendment "search" because plates and "information behind them are within

the control and custody of the state through the Registry of Motor Vehicles)." However, the court in *Myrick* noted that the MDT check would have been constitutionally invalid had there been "proof of a racial or class pattern to the police officer's selections." *Id.* at 293 n. 10, 659 *A.2d* 976.

That view of MDT checks was ratified by the Appellate Division the following year. *State v. Lewis,* 288 *N.J.Super.* 160, 164, 671 *A.2d* 1126 (1996) ("We are in full accord with [the court's] analysis of essentially the same issue now before us, and, therefore we affirm the denial of defendant's motion to suppress for the reasons stated in *Myrick.*"). In *Lewis,* the court upheld the random check of a license plate by a police officer who was "occupying his time" because the traffic was light. *Id.* at 162, 164, 671 *A.2d* 1126.

We took a similar approach in *Donis, supra,* 157 *N.J.* at 54, 723 *A.2d* 35, where we upheld "random" MDT checks against a New Jersey constitutional challenge under Article I, paragraph 7 of the New Jersey Constitution, in a case in which the police did not apply any objective criteria in choosing whose plates to run. In that case, we expressly extended to license plates the Supreme Court's analysis in *New York v. Class,* 475 *U.S.* 106, 114, 106 *S.Ct.* 960, 966, 89 *L.Ed.2d* 81, 90 (1986), which held that there was no reasonable expectation of privacy in an object required by law to be placed in plain view on an automobile exterior. *Id.* at 54–55, 723 *A.2d* 35.

Although that holding eliminated traditional constitutional concerns relevant to the basic motor vehicle information, in *Donis* we invoked provisions of the Right to Know Law, *N.J.S.A.* 39:2–3.3 and 39:2–3.4, to insulate "the personal information" of motorists. *Id.* at 55–56, 723 *A.2d* 35. We thus imposed a two-step process whereby motor vehicle information would be provided initially, and only if that information disclosed a basis for further action would the police be empowered to gain access to a registered owner's personal information such as name, address, social security number, and criminal record. *Ibid.* Finally, we noted that "there are no claims [in this case] that the police targeted or stopped

petitioners' cars based on impermissible motives," *id.* at 57, 723 *A.*2d 35, thus recognizing implicitly, at least, that such motivation is problematic.

■ Recently, in *Maryland,* supra, 167 *N.J.* 471, 771 *A.*2d 1220, we addressed racial targeting claims in connection with a "field inquiry" that led to the discovery of marijuana on a defendant's person. We held that "absent any impermissible reason ... the officers were permitted to make a field inquiry 'without grounds for suspicion,'" because the "Fourth Amendment is simply not implicated in such cases." *Id.* at 483, 771 *A.*2d 1220 (quoting *State v. Contreras,* 326 *N.J.Super.* 528, 538, 742 *A.*2d 154 (App.Div. 1999), and citing *Florida v. Royer,* 460 *U.S.* 491, 497–98, 103 *S.Ct.* 1319, 1324, 75 *L.Ed.*2d 229, 236 (1983)). We underscored, however, that under the Equal Protection Clause of the Fourteenth Amendment the police could not "rely on impermissible criteria to question individuals." *Id.* at 484, 771 *A.*2d 1220.

> The Equal Protection Clause of the Fourteenth Amendment requires that the selection of a person for a field inquiry, referred to as a consensual encounter with the police in some of the federal cases, may not be based solely on that person's race absent some compelling justification that pre-existed the police approaching the individual. *United States v. Woods,* 213 *F.3d* 1021, 1022–23 (8th Cir.2000); *United States v. Travis,* 62 *F.3d* 170, 174–75 (6th Cir.1995), *cert. denied,* 516 *U.S.* 1060, 116 *S.Ct.* 738, 133 *L.Ed.*2d 688 (1996); *see also Whren v. United States,* 517 *U.S.* 806, 813, 116 *S.Ct.* 1769, 1774, 135 *L.Ed.*2d 89, 97 (1996) (explaining that Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race"). We reach the same conclusion under Article I, paragraphs 1 and 5 of the New Jersey Constitution. *State v. Kennedy,* 247 *N.J.Super.* 21, 29–31, 588 *A.2d* 834 (App.Div.1991). The objective reasonableness standard for deciding the constitutionality of a search articulated in *State v. Bruzzese,* 94 *N.J.* 210, 219, 463 *A.2d* 320 (1983), is not satisfied when the only reason for the search is the individual's race. For the same reason, a field inquiry or an investigatory stop predicated solely on race would be equally defective. *Id.* at 226, 463 *A.2d* 320.
>
> [*Id.* at 485, 771 *A.*2d 1220]

*See also Whren,* supra, 517 *U.S.* at 813, 116 *S.Ct.* at 1774, 135 *L. Ed.*2d at 97–98 (explaining that although subjective intentions play no role in Fourth Amendment analysis, Equal Protection Clause bars racially-based selective enforcement); *United States v. Avery,* 137 *F.3d* 343, 353 (6th Cir.1997) (holding that Equal Protection Clause but not Fourth Amendment applies during pre-contact stage of criminal investigation). Once it has been estab-

lished that selective enforcement has occurred in violation of Article I, paragraphs 1 and 5 of the New Jersey Constitution, the fruits of that search will be suppressed. *Maryland, supra,* 167 *N.J.* at 485, 489, 771 *A.*2d 1220 (citing *State v. Kennedy,* 247 *N.J.Super.* 21, 29–31, 588 *A.*2d 834 (App.Div.1991)). The rationales that support the suppression of evidence under Article I, paragraph 7, namely, deterrence of impermissible investigatory behavior and maintenance of the integrity of the judicial system, apply equally, if not more so, to cases of racial targeting.

In short, if race is the sole motivation underlying the use of an MDT, it is illegal and the evidence resulting from a subsequent stop must be suppressed. Indeed, the parties do not question those principles. All agree that if Officer Williams used the MDT to check Segars's license based on his race, his action would be interdicted. The issue before us is whether the Municipal Court erred in ruling that the record did not support such a conclusion.

## IV

To resolve that issue, a preliminary matter requires disposition: What burden does each party bear in a case involving improper racial targeting? Because racial targeting is a subset of the generic subject of discrimination, most cases have used the Title VII, *U.S.C.A.* § 2000e–2, model for the analysis. *See, e.g., State v. Gilmore,* 103 *N.J.* 508, 533–39, 511 *A.*2d 1150 (1986) (using Title VII model to frame litigation alleging discriminatory use of peremptory challenges). Under that model, a defendant advancing such a claim has the ultimate burden of proving by a preponderance of the evidence that the police acted with discriminatory purpose, *i.e.,* that they selected him because of his race. *Avery, supra,* 137 *F.*3d at 355 (citing *Travis, supra,* 62 *F.*3d at 174; *cf. Mogull v. CB Commercial Real Estate Group,* 162 *N.J.* 449, 464, 744 *A.*2d 1186 (2000) (explaining that Law Against Discrimination assigns ultimate burden of proof to plaintiff, leaving no doubt that "a plaintiff who fails to prove discrimination by a preponderance of the evidence loses")); *Bergen Commercial Bank v. Sisler,* 157

*N.J.* 188, 211, 723 *A.*2d 944 (1999) (stating that in age discrimination cases, employee at all times retains burden of showing by preponderance of evidence that age was factor in decision to discharge employee); *Gilmore, supra,* 103 *N.J.* at 539, 511 *A.*2d 1150 (stating that defendant "has the ultimate burden of proving, by a preponderance of the evidence, that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds").

In addition to that ultimate burden, defendant bears the preliminary obligation of establishing a *prima facie* case of discrimination. A *prima facie* case is one in which the evidence, including any favorable inference to be drawn therefrom, could sustain a judgment. Pressler, *Current N.J. Court Rules,* cmt. on *R.* 4:37–2(b) (2002); *Bozza v. Vornado, Inc.,* 42 *N.J.* 355, 357–58, 200 *A.*2d 777 (1964). Once a defendant through relevant evidence and inferences establishes a *prima facie* case of racial targeting, the burden of production shifts to the State to articulate a race-neutral basis for its action. *Avery, supra,* 137 *F.3d* at 356; *cf. Gilmore, supra,* 103 *N.J.* at 537–38, 511 *A.*2d 1150 (describing burden-shifting in context of alleged race-based peremptory challenges).

That burden of production "has been described as so light as to be 'little more than a formality.'" *Mogull, supra,* 162 *N.J.* at 469, 744 *A.*2d 1186 (quoting *Developments in the Law—Employment Discrimination: Shifting Burdens of Proof in Employment Discrimination Litigation,* 109 *Harv. L.Rev.* 1579, 1590 (1996)). It is met whether or not the evidence produced is found to be persuasive. *Ibid.* (citing *St. Mary's Honor Ctr. v. Hicks,* 509 *U.S.* 502, 509, 113 *S.Ct.* 2742, 2748, 125 *L.Ed.*2d 407, 417 (1993)). In other words, the determination of whether the party defending against an Equal Protection challenge has met its burden of production "'can involve no credibility assessment.'" *Ibid.* (quoting *St. Mary's, supra,* 509 *U.S.* at 509, 113 *S.Ct.* at 2748, 125 *L.Ed.*2d at 417). What is required is that the evidence produced shows a race-neutral motivation and thus raises a genuine issue of fact framed with sufficient clarity so that the other party has "a full

and fair opportunity to demonstrate pretext." *Texas Dep't of Community Affairs v. Burdine,* 450 *U.S.* 248, 255–56, 101 *S.Ct.* 1089, 1094–95, 67 *L.Ed.*2d 207, 216–17 (1981).

For the State to prevail, it cannot remain silent once a *prima facie* case has been established by a defendant because the "[e]stablishment of the *prima facie* case in effect creates a presumption that the [State] unlawfully discriminated against the [defendant]." *St. Mary's, supra,* 509 *U.S.* at 506, 113 *S.Ct.* at 2747, 125 *L.Ed.*2d at 416; *Gilmore, supra,* 103 *N.J.* at 537, 511 *A.*2d 1150 ("If the trial court finds that the defendant has established a *prima facie* case, this in effect gives rise to a presumption of unconstitutional action that it is the burden of the prosecution to rebut."). However, once the State has met its burden of production by articulating a race-neutral explanation for its actions, the presumption of discrimination "simply drops out of the picture." *St. Mary's, supra,* 509 *U.S.* at 510–11, 113 *S.Ct.* at 2749, 125 *L.Ed.*2d at 418.

Defendant retains the ultimate burden of proving discriminatory enforcement. *Burdine, supra,* 450 *U.S.* at 256, 101 *S.Ct.* at 1095, 67 *L.Ed.*2d at 217; *see also United States v. Armstrong,* 517 *U.S.* 456, 465, 116 *S.Ct.* 1480, 1487, 134 *L.Ed.*2d 687, 699 (1996) (addressing claim of discriminatory prosecution); *McCleskey v. Kemp,* 481 *U.S.* 279, 292, 107 *S.Ct.* 1756, 1767, 95 *L.Ed.*2d 262, 278 (1987) (addressing claim of discriminatory enforcement of the death penalty); *Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 *U.S.* 252, 270, 97 *S.Ct.* 555, 566, 50 *L.Ed.*2d 450, 468 (1977) (addressing claim of housing discrimination); *State v. Halsey,* 340 *N.J.Super.* 492, 501, 774 *A.*2d 693 (App.Div.2001) (addressing claim of discriminatory police traffic stop); *cf. Grigoletti v. Ortho Pharm. Corp.,* 118 *N.J.* 89, 98, 570 *A.*2d 903 (1990) (stating that in employment discrimination suit, " 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff; only the burden of going forward shifts' ") (quoting *Andersen v. Exxon Co.,* 89 *N.J.* 483, 492, 446 *A.*2d 486 (1982)).

We applied that burden-shifting template in *State v. Maryland:*

Because an *inference of selective law enforcement was raised*, and because there were three disparate and inconsistent versions of defendant's encounter with the police, *the State was required to have established a non-discriminatory basis for the officers to conduct a field inquiry.* The paper-bag version of events is the only possible basis, on this record, that could rebut the selective enforcement inference. Yet, that version appears to be based only on a hunch that defendant was carrying contraband in the paper bag. We do not intend to suggest that ordinarily a proper field inquiry could not be based on a hunch. But that rationale will not do here. *Because the totality of the record* suggests that the hunch itself was, in our view, at least in part based on racial stereotyping, it *was insufficient to rebut the inference of selective law enforcement* that tainted the police conduct. *The officers' field inquiry is therefore defective.*

[*Maryland, supra,* 167 *N.J.* at 486, 771 *A.*2d 1220 (emphasis added).]

█ We apply a similar analysis to this record. When a defendant claims that an MDT check was based on his race, he bears the burden of establishing a *prima facie* case by producing relevant evidence that would support an inference of discriminatory enforcement. If the defendant does so, the burden shifts to the State to produce evidence of a race-neutral reason for the check. Ultimately, the defendant bears the burden of proving discriminatory treatment by a preponderance or greater weight of the credible evidence.

█ Here, Officer Williams testified that he never used the automated teller machine during the events in question, that he never saw Segars, that he did not know Segars's race before the MDT check, that the MDT check was totally random, and that he checked and ticketed others, including a Caucasian motorist, during the same period. Segars testified that Officer Williams used the automated teller machine immediately before he did and knew his race before the MDT check. Segars attested to the remainder of Officer Williams's testimony, acknowledging that Officer Williams treated him politely and that the other ticketed motorist' was Caucasian. Segars's additional proof (the Bank of New York records) established that Officer Williams did, in fact, use the automated teller machine one minute before Segars, checked Segars's plates two minutes after he saw him, and then did not testify accurately about those occurrences. From that evidence, a trier of fact could infer that Officer Williams checked Segars's

plates because of his race and testified falsely about what he did because he knew that racial targeting is wrong. Put another way, Segars met his burden of establishing a *prima facie* case of selective enforcement.

 The State met its burden of production through Officer Williams's unequivocal testimony that the MDT check of Segars's license plates was part of his practice of randomly checking plates whenever he has the time, and that the check of Segars's plates was one of three executed during the same period. That was a race-neutral explanation not subject to a credibility assessment at the production phase of the case. Both parties having met their burdens of production, the question then became whether, on the total record, Segars met his burden of persuasion. Because the evidence that raised the inference of racial targeting also impeached Officer Williams's race-neutral rationale, a critical part of the State's rebuttal should have been the production of an explanation for Officer Williams's inaccurate testimony. No such explanation was forthcoming. That is the pivotal point in the case.

Indeed, it is difficult to understand why the State did not recall Officer Williams after his testimony was found to be inconsistent with bank records. That required the court to speculate why the officer testified as he did. Officer Williams was a witness fully within the State's control, who naturally would have been expected to explain the inaccuracy in his testimony. The failure to produce him was, at best, a tactical error and, at worst, an indication that the State feared that Officer Williams's testimony would be unfavorable. *See State v. Clawans,* 38 *N.J.* 162, 170, 183 *A.*2d 77 (1962).

 In sum, an inference of discriminatory targeting was established by Segars's testimony and documentary evidence, Officer Williams's inaccurate testimony, and the failure of the State to recall Officer Williams for an explanation. The State did not defeat that inference. The only evidence advanced by the State to support Williams's explanation and counter the inference was that Williams also checked the plates of a Caucasian driver.

However, that cannot serve as a counterweight to the inference because Officer Williams acknowledged that he did so as a result of observing an expired inspection sticker on the Caucasian motorist's car. By that testimony, Officer Williams revealed that that motorist was not checked randomly, but "for cause." Such a for cause stop is irrelevant in determining whether the Officer's claimed "random" stops were racially motivated. The race of the third driver whose license plates were checked is unknown and consequently that MDT check cannot support an inference for or against the racial targeting of Segars.

It goes without saying that it was not appropriate for the Municipal Court to proffer an explanation for Officer Williams's inaccurate testimony. Although those reasons may well have been correct, they had to be advanced by Officer Williams himself and he had to be subject to a credibility evaluation with respect to them. The court's suggestion, for example, that the officer testified falsely to cover the fact that he engaged in a personal errand during his duty shift, although possibly true, is essentially an explanation with no support in the record. As Judge Stern observed in his dissent, we cannot "uphold the municipal court's factually unsupported suggestions" to bolster Officer Williams's credibility. Indeed, the Municipal Court believed Segars and recognized that Officer Williams had not testified accurately about how he came to check Segars's plates. Those are the credibility findings to which the reviewing tribunals were required to defer under *Locurto, supra.* Certainly, no deference was to be accorded the wholly unsupported conclusions the Municipal Court reached by speculating about what prompted the officer's inaccurate testimony.

## V

This is a very unusual case. Without Officer Williams's repudiated testimony, the evidence produced by Segars that Officer Williams saw him prior to the MDT check would have been completely inadequate to support an inference of discriminatory

enforcement. Because Officer Williams's misstatements went to the heart of Segars's claims and would have allowed a trier of fact to conclude that Officer Williams dissembled because he practiced racial targeting and knew that it was wrong, the State needed to recall Officer Williams to explain his testimony. Had it done so, thereby subjecting him to a credibility evaluation, and had that evaluation by the Municipal Court been favorable, appellate courts properly could have deferred to that judgment under *Locurto, supra.* All that Officer Williams had to do was take the stand again and admit that he had made a mistake in his earlier testimony. Because that did not occur, we can have no confidence in the evidence the State produced to counter the inference of racial targeting. That is the import of Judge Stern's dissent with which we are in full agreement. In short, we believe that under the unusual facts of this case, a reasonable fact-finder would have to find that Segars had met his burden of persuasion.

## VI

The judgment of the Appellate Division is reversed.

LONG, J. dissenting.

I would affirm the judgment of the Appellate Division that deferred to the credibility evaluation of the trial court.

The majority has essentially adopted Segars's argument that the Municipal Court was not free to accept any of Officer Williams's evidence once it found that he made a statement that was untrue. Although not denominated as such, that contention is obviously based on the "false-in-one, false-in-all" inference. *State v. Fleckenstein,* 60 *N.J.Super.* 399, 408, 159 *A.*2d 411 (App.Div.), *certif. denied,* 33 *N.J.* 109, 162 *A.*2d 338 (1960). However, it is well established that false-in-one, like other inferences, is permissive and not mandatory. Thus, a trier of fact who finds an inaccuracy in a witness's testimony may, but need not, entertain the inference. *Ibid.* (citing *State v. Guida,* 118 *N.J.L.* 289, 297, 192 *A.* 445 (Sup.Ct.1937), *aff'd,* 119 *N.J.L.* 464, 196 *A.* 711 (E. &

A.1938)); *see also State v. Humphrey,* 183 *N.J.Super.* 580, 584, 444 *A.*2d 1135 (Law Div.1982), *aff'd,* 209 *N.J.Super.* 152, 507 *A.*2d 241 (App.Div.1986) (contrasting permissive nature of inferences with compulsory nature of presumptions). If the false-in-one, false-in-all inference is not adopted, the trier of fact brings to bear the ordinary rules for judging credibility and may accept none, some, or all of a witness's evidence. Indeed, that is what we empower jurors to do every day. The Model Jury Charge provides:

### (Sample One)

If you believe that any witness deliberately lied to you, on any fact significant to your decision in this case, you have the right to reject all of that witness's testimony. However, in your discretion you may believe some of the testimony and not believe other parts of the testimony.

### (Sample Two)

If you believe that any witness or party willfully or knowingly testified to any facts significant to your decision in the case, with intent to deceive you, you may give such weight to his or her testimony as you deem it is entitled. You may believe some of it, or you may, in your discretion, disregard all of it.

[*Model Jury Charges (Civil),* § 1.12M False in One, False in All (Nov.1998).]

Here, the Municipal Court had an opportunity to observe the character and demeanor of Officer Williams when he took the stand. Those observations put that court in the best position to evaluate the officer's credibility. *State v. Johnson,* 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964) (stating that appellate courts "should give deference to those findings of the trial judge which are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy"). I note that the court did not simply accept Officer Williams's testimony uncritically and indeed rejected a portion of it in favor of Segars's version of the events. However, it did accept the remainder of Officer Williams's testimony, much of which was supported by Segars.

It is a deeply rooted principle of our jurisprudence that "[a]ppellate courts should defer to trial courts' credibility findings that are influenced by matters such as observations of the character and

demeanor of witnesses and common human experience that are not transmitted by the record." *State v. Locurto,* 157 *N.J.* 463, 474, 724 *A.*2d 234 (1999). Such deference is not limited to cases in which the appellate court agrees with the trial court's assessment. *Zahner v. Pathmark Stores, Inc.,* 321 *N.J.Super.* 471, 476, 729 *A.*2d 478 (App.Div.1999). Indeed, the basic underpinning of deference in such circumstances is that the appellate court is ordinarily in no position to judge a witness's credibility. On the contrary, it is the trial court in which we repose the ultimate responsibility for determining whether a witness is truthful. *In re Return of Weapons to J.W.D.,* 149 *N.J.* 108, 117, 693 *A.*2d 92 (1997).

To be sure, an appellate court may intervene if a trial court's credibility evaluation is "undoubtedly mistaken." *Lautek Corp. v. Image Bus. Sys. Corp.,* 276 *N.J.Super.* 531, 541, 648 *A.*2d 488 (App.Div.1994). There is simply no basis for such a conclusion in this case. Officer Williams obviously was wrong in his testimony regarding the circumstances under which he encountered Segars. The Bank of New York records proved that. Certainly, it would have been preferable for the State to recall Officer Williams at that point and refresh his recollection with those records. However, it is obvious why the prosecutor saw no need to do so. Even before those records were produced, the Municipal Court had concluded that it was much more likely that Segars's version was correct because his memory of the event would naturally be clearer than that of Officer Williams, to whom an MDT check was "business as usual." Critically, the court believed Officer Williams when he said he did not racially target Segars, but conducted a random check of several license plates during the relevant period. The police records supported Officer Williams, showing that he, in fact, checked three plates within a four-minute period and that Segars's was not the first one checked after their encounter. Segars further attested to the ticketing of the Caucasian driver and to Officer Williams's polite and helpful demeanor. In short, there was objective evidence to undergird the Municipal Court's assessment of Officer Williams's credibility and its ultimate determination that Segars did not prove discriminatory targeting.

Although Segars established a *prima facie* case based on Officer Williams's misstatements and the inference that could be drawn therefrom, that did not require a verdict in his favor. *Cf. St. Mary's Honor Ctr. v. Hicks,* 509 *U.S.* 502, 515, 113 *S.Ct.* 2742, 2751, 125 *L.Ed.*2d 407, 421 (1993) ("Quite obviously, however, what is required to establish the ... *prima facie* case is infinitely less than what a directed verdict demands"). Put another way, the Municipal Court was free to adopt the permissive inference of discriminatory targeting advanced on Segars's case, but was not compelled to do so. In fact, although crediting Segars's testimony, it rejected the inference of discriminatory targeting based on its favorable evaluation of the bulk of Officer Williams's testimony as supported by other evidence in the case and as supported by the court's assessment of the officer's believability when he testified. On the total record, I am satisfied that the reviewing courts properly deferred to that judgment and that there is no warrant for our intervention.

I am also concerned about the effect of the majority opinion on our jurisprudence. It opens the door to wholesale rejection of police testimony based solely on the problem of fallible memory. In my experience, when police officers testify about criminal and quasi-criminal events, which they encounter many times every day, often under very similar circumstances, mistakes, even on important details, are not at all unusual. Police personnel testify from old reports while defendants, to whom the criminal charges are unique, testify from memories on which the facts are emblazoned. The likelihood that a truthful defendant is more accurate in detail is a high one. That should not automatically jettison a police officer's testimony. The majority opinion alters what has classically been our approach in such circumstances—to leave to the trier of fact judgments regarding credibility, taking into account not only the story that is told, but also the demeanor of the teller. I would continue to adhere to that rule.

Justice LaVECCHIA joins in this opinion.

*For reversing*—Chief Justice PORITZ and Justices STEIN, COLEMAN, VERNIERO, and ZAZZALI—5.

*For affirming*—Justices LONG and LaVECCHIA—2.