**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3979-18

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

DENNIS J. RUFFIN,

 Defendant-Appellant.

_____

   Submitted November 16, 2020 – Decided March 8, 2021

   Before Judges Rothstadt and Susswein.

   On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Municipal Appeal No. 18-51.

   Eldridge Hawkins, attorney for appellant.

   Mark Musella, Bergen County Prosecutor, attorney for respondent (Ian C. Kennedy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

 Defendant, Dennis J. Ruffin, appeals from his convictions for driving while under the influence (DUI) of a narcotic, hallucinogenic, or habit-

producing drug, N.J.S.A. 39:4-50, and failure to voluntarily turn over a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(c).[1]  In June 2018, defendant was tried in municipal court over the course of four days and found guilty of both offenses.  In a trial de novo on the record in the Law Division, Judge Christopher Kazlau also found defendant guilty of both offenses and on April 29, 2019 rendered a twenty-nine-page written opinion.  We affirm defendant's convictions substantially for the reasons set forth in Judge Kazlau's thorough and thoughtful opinion.

I.

The following facts were adduced at the municipal court trial.  In the afternoon hours of July 2, 2017, Ridgewood police responded to a 9-1-1 call that a black SUV was stationary in the roadway near an intersection, forcing other vehicles to change lanes to navigate around it.  The caller identified herself to the operator and reported that she had observed the stationary SUV for approximately three minutes.  When she finally drove past it, she saw a bald

---

[1]  Defendant was initially charged by the Ridgewood Police Department with third-degree unlawful possession of cocaine, N.J.S.A. 2C:35-10(a)(1).  The day after the arrest, the Bergen County Prosecutor's Office downgraded the third-degree charge to the disorderly persons offense of failure to voluntary turn over CDS.

A-3979-18

man in the driver's seat with his head hanging down, not moving. She called 9-1-1 because she believed the man might be in need of medical attention.

Officer Zachary Knudson was dispatched to investigate. After patrolling the area for approximately fifteen minutes, he saw a black Jeep Grand Cherokee in a parking lot near the intersection. Officer Knudson approached the vehicle and observed an African American man sitting in the driver's seat in a semi-upright position. The window of the parked SUV was already down. The officer did not use his patrol vehicle to block the parked SUV, nor did he order defendant to step out of the vehicle.

Officer Knudson engaged defendant in conversation, advising him that he was responding to a report of an African American man asleep while stopped at a traffic light.[2] Defendant acknowledged that it was indeed his vehicle that had been stationary in the roadway minutes earlier. The officer testified that defendant explained that,

> he was not sleeping, but he had his head down thinking at the traffic light. And the reason for that was because he was – he had brought a friend of his up here for a job interview. And when they had finished the interview they were going home together in separate vehicles, and she left him. And Mr. Ruffin stated that he was upset

---

[2] Defendant disputes that the 9-1-1 caller mentioned the race of the man who appeared to be asleep at the wheel of the black SUV.

A-3979-18

for that reason, and he was lost. And he had his head down at the traffic light thinking about that.

Officer Knudson carefully observed defendant's physical appearance and demeanor during their conversation. He testified that defendant was "upset, lethargic and sleeping, his sentences tapered off toward the end, he was unable to complete sentences, and he was having rambling thoughts." Another Ridgewood officer arrived at the scene and made similar observations, describing defendant's slow speech, an inability to answer questions, and bloodshot, watery eyes. Both officers were confused by defendant's explanation for stopping at the intersection, noting that his story "was dragging on[,]" with "no rhyme or reason to it." The officers determined from defendant's appearance and demeanor that he could not safely operate a vehicle, though they were not yet certain whether this was due to a medical condition or intoxication.

A third officer, Lieutenant Brian Pullman, arrived at the scene and ordered defendant to step out of the SUV. Lieutenant Pullman observed defendant swaying from side to side and having difficulty standing. Defendant disclosed that he had medical problems involving his heart and lungs and that he took two prescribed medications to manage those conditions.

Lieutenant Pullman administered field sobriety tests after determining that defendant did not have a physical disability that would impact his performance.

4

Lieutenant Pullman first administered the horizontal gaze nystagmus (HGN) test. That test indicated the presence of a depressant in defendant's system. Lieutenant Pullman next administered the walk-and-turn test. Defendant lost his balance, pausing and not turning around. Lieutenant Pullman then administered the one-leg-stand test. Defendant performed poorly even after Lieutenant Pullman allowed him a second attempt. Lieutenant Pullman concluded from the battery of tests that defendant was impaired.

Defendant was placed under arrest for DUI. In the ensuing search of his person, police found a glassine bag inside defendant's wallet that contained a small white rock of suspected crack cocaine. Defendant later admitted the bag contained crack, which was confirmed by a laboratory test conducted by the New Jersey State Police.

Defendant was advised of and waived his Miranda rights.[3] At the police station, a Drug Recognition Expert (DRE), Sergeant John Chuck, performed a drug recognition examination. Sergeant Chuck testified that defendant exhibited poor coordination, had difficulty keeping his body in a normal position, and trouble completing his thought processes in response to questions. Sergeant Chuck repeated the walk-and-turn and one-leg-stand tests that had been

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3979-18

administered before defendant was arrested. The sergeant also administered the Romberg balance test and the finger-to-nose test. He next examined defendant's pupil size and nasal cavity. The latter examination revealed the presence of crystals on defendant's nose hairs. Sergeant Chuck also noted defendant's flaccid muscle tone.

Sergeant Chuck asked defendant if he had consumed any other drugs besides the two prescribed medications that he had previously disclosed. Defendant admitted he had ingested heroin. Defendant signed a consent form and gave a urine sample. Subsequent analysis of defendant's urine revealed the presence of cocaine, codeine, morphine, 06-monoacetylmorphine, fentanyl, and alprazolam.

Based on this evidence, the municipal judge found defendant guilty of both charged offenses and rendered an oral decision on July 12, 2018. Defendant was sentenced on the DUI conviction to a suspension of driving privileges for seven months, twelve hours at an intoxicated driver resource center, and $689 in fines and penalties. On the disorderly persons conviction for failing to turn over the crack cocaine to law enforcement authorities, the municipal judge imposed a concurrent six-month suspension of driving privileges and $1058 in fines and penalties. Defendant appealed the municipal

court convictions to the Law Division for de novo review. As we have noted, after reviewing the record and hearing oral argument, Judge Kazlau found defendant guilty of both offenses and imposed the same sentence.

Defendant raises the following arguments for our consideration:

POINT I:
LAW ENFORCEMENT'S INITIAL INTERACTION WITH MR. RUFFIN WAS UNCONSTITUTIONAL AND [THEY] DID NOT HAVE PROBABLE CAUSE TO ARREST HIM ON DWI, THEREBY ALLOWING THIS COURT TO CONCLUDE THAT ALL EVIDENCE OBTAINED THEREAFTER MUST BE SUPPRESSED AS A RESULT OF THE FRUIT OF THE POISONOUS TREE DOCTRINE

POINT II:
[DEFENDANT'S] CASE MUST BE DISMISSED BECAUSE THE STATE NEVER MADE AN OPENING STATEMENT IN THE MUNICIPAL COURT TRIAL OR THE SUPERIOR COURT TRIAL AS REQUIRED PURSUANT TO R. 1:7-1

POINT III:
LAW ENFORCEMENT HAD NO PROBABLE CAUSE TO ARREST MR. RUFFIN FOR DWI

POINT IV:
THE EVIDENCE ADDUCED AT TRIAL DEMONSTRATED THAT MR. RUFFIN WAS NOT GUILTY OF DRIVING WHILE UNDER THE INFLUENCE OF A NARCOTIC, HALLUCINOGENIC, OR HABIT-PRODUCING DRUG BEYOND A REASONABLE DOUBT

POINT V:

MR. RUFFIN IS NOT GUILTY OF FAILING TO TURN OVER CDS TO LAW ENFORCEMENT AS SAME IS THE FRUIT OF THE POISONOUS TREE

POINT VI:
THE STATE VIOLATED R. 1:7-1 BY NOT MAKING AN OPENING STATEMENT AT THE MUNICIPAL COURT TRIAL AND ALSO AT THE SUPERIOR COURT DE NOVO TRIAL
a. LAW ENFORCEMENT HAD NO PROBABLE CAUSE TO ARREST MR. RUFFIN ON SUSPICION OF DWI

POINT VII:
THE INITIAL ENCOUNTER BETWEEN LAW ENFORCEMENT AND MR. RUFFIN WAS NOT LAWFUL PURSUANT TO THE COMMUNITY CARETAKING DOCTRINE

POINT VIII:
LAW ENFORCEMENT HAD NO PROBABLE CAUSE TO ARREST MR. RUFFIN ON SUSPICION OF DWI, AND THERE WAS INSUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT THAT HE WAS GUILTY OF DWI
a. LAW ENFORCEMENT HAD NO PROBABLE CAUSE TO ARREST MR. RUFFIN ON SUSPICION OF DWI
b. THE EVIDENCE ESTABLISHES BEYOND A REASONABLE DOUBT THAT MR. RUFFIN WAS IMPROPERLY TARGETED AS A BLACK MALE AND THUSLY UNCONSTITUTIONALLY STOPPED

POINT IX:
THE EVIDENCE ESTABLISHES BEYOND A REASONABLE DOUBT THAT MR. RUFFIN WAS NOT GUILTY OF FAILING TO TURN OVER CDS

A-3979-18

TO LAW ENFORCEMENT AS THE STOP AND SEARCH WERE CONTRARY TO THE UNITED STATES CONSTITUTION AMENDMENTS IV AND V

II.

Because we affirm substantially for the reasons explained in Judge Kazlau's comprehensive written opinion, we need not re-address defendant's arguments at length. We first consider defendant's contention that the police violated his constitutional right to be free from unreasonable searches and seizures. Defendant argues that the police unlawfully initiated an investigative detention in response to the 9-1-1 call. He also contends that the officers never developed probable cause to believe he committed a DUI offense and accordingly did not have lawful authority to arrest him or conduct the search incident thereto that revealed the crack cocaine found on his person.

We note as a threshold matter that defendant never made a pretrial motion to suppress. Rather, defense counsel first raised these Fourth Amendment claims in his closing argument at the conclusion of the four-day trial. Rule 7:5-2(b), which governs Fourth Amendment motions practice in the municipal court, provides that if a search is made without a warrant, "a brief stating the facts and arguments in support of the motion shall be submitted with the notice of motion." So far as the record shows, defendant never submitted a brief to the

9

trial court. The rule also provides that, "[a]ll motions to suppress shall be heard before the start of the trial." Clearly, defense counsel did not comply with these procedures by first raising his Fourth Amendment claims in his closing arguments after the State had rested.

Rule 7:5-2(d) expressly provides that "[u]nless otherwise ordered by the court for good cause, defendant's failure to make a pretrial motion to the municipal court pursuant to this rule shall constitute a waiver of any objection during trial to the admission of the evidence on the ground that the evidence was unlawfully obtained." We nonetheless choose to address defendant's Fourth Amendment arguments on their merits.

We begin our analysis by noting that Officer Knudson did not pull over defendant's vehicle, which was already parked when the officer approached it. The officer also did not use his patrol vehicle to block in defendant's car. Cf. State v. Rosario, 229 N.J. 263, 276 (2017) (holding that defendant was subjected to an investigative detention, and not just a field inquiry, when the officer used his patrol vehicle to block in the defendant's car that was lawfully parked in front of her house). Nor did Officer Knudson order defendant to exit his vehicle, order him to produce identification credentials, or make any other demands. Rather, Officer Knudson merely engaged defendant in conversation through the

driver-side window that was already open. Specifically, the officer asked defendant if he had any information about a driver who was reported to be asleep at the wheel while in the roadway at the nearby traffic light.

In these circumstances, we believe the police-citizen encounter began as a field inquiry that could be conducted without grounds for suspicion. See State v. Maryland, 167 N.J. 471, 483–84 (2001) (holding that an officer has not seized a person under the Fourth Amendment if his questions are put in a conversational manner that is not overbearing or harassing in nature and does not make demands or issue orders). See also State v. Nishina, 175 N.J. 502, 510 (2001) (noting a police-citizen encounter constitutes a permissible field inquiry when an officer questions a citizen in a conversational manner that is not harassing, overbearing, or accusatory in nature).

Furthermore, as Judge Kazlau correctly noted, this encounter falls under the community caretaking doctrine. In State v. Scriven, our Supreme Court held that "[i]n their community-caretaker role, police officers, who act in an objectively reasonable manner, may check on the welfare or safety of a citizen who appears in need of help . . . without securing a warrant or offending the Constitution." 226 N.J. 20, 38 (2016). The Court further held, "[p]olice officers who have an objectively reasonable basis to believe that a driver may be

impaired or suffering a medical emergency may stop the vehicle for the purpose of making a welfare check and rendering aid, if necessary."[4] Id. at 39. The vehicle need not be in motion for the community caretaking doctrine to apply. See State v. Drummond, 305 N.J. Super. 84, 89–90 (App. Div. 1997) (applying the community caretaking doctrine to justify speaking with occupants of a darkened automobile parked near a closed car wash at night).

In the present instance, there was an objectively reasonable basis for Officer Knudson to exercise the community caretaking function, first to determine whether defendant's vehicle was the SUV that had been stationary in the roadway, and then to determine whether defendant was in need of medical assistance. See State v. Washington, 296 N.J. Super. 569, 572 (App. Div. 1997) (holding the objective reasonableness of the exercise of the community caretaking function "is measured by the dynamics or totality of the circumstances from the perspective of the officer on duty at the time."). We emphasize that Officer Knudson was responding to a citizen's 9-1-1 report of a driver who appeared to be unconscious and in need of medical attention.

---

[4] We reiterate that Officer Knudson did not "stop" defendant's vehicle, which was already parked when the officer arrived at the scene. But even if the parking lot encounter at the outset were deemed to be an investigative detention, Officer Knudson clearly had an objectively reasonable basis to justify a welfare check under the rule announced in Scriven.

A-3979-18

After defendant confirmed that he was the person described in the 9-1-1 call, Officer Knudson continued to investigate the circumstances of defendant's physical condition, but still did not issue commands or otherwise suggest to defendant that he was not free to leave. It was not until Lieutenant Pullman arrived and ordered defendant to exit the SUV that the encounter escalated to an investigative detention requiring reasonable and articulable suspicion to believe that defendant had committed a motor vehicle offense. By this point, based on defendant's responses to questions and his physical appearance, police had ample basis to suspect (1) that he was impaired, and (2) that he had minutes earlier operated the vehicle by driving it from the public road to the parking lot.

When defendant stepped out of the SUV, he had trouble standing and continued to exhibit signs of intoxication. Lieutenant Pullman thus had an objectively reasonable basis to administer field sobriety tests as part of the investigative detention. When defendant failed those tests, the officers had probable cause to arrest defendant for DUI and to transport him to the police station for further testing. See State v. Bernokeits, 423 N.J. Super. 365, 375 (App. Div. 2011) (recognizing that the results of field sobriety testing can be used to establish probable cause to arrest).

A-3979-18

Once arrested, and before transporting defendant to the station, police lawfully conducted a search of defendant's person incident to that arrest, revealing the crack cocaine that had been concealed in defendant's wallet.[5] State v. Dangerfield, 171 N.J. 446, 462–63 (2002) (affirming authority of police to conduct an automatic search incident to a lawful arrest regardless of the nature or seriousness of the offense for which the defendant is lawfully arrested).

In sum, each step undertaken by the police in the unfolding sequence of events was objectively reasonable and lawful based on the information available to them before each decision. See Scriven, 226 N.J. at 38. The police-citizen encounter was lawfully initiated in the exercise of the community-caretaking responsibility of police to respond to the 9-1-1 call of a traffic hazard and a person who was possibly in medical distress. What started as a field inquiry to investigate the 9-1-1 report escalated to a lawful investigative detention after the officers' initial inquiries and observations established reasonable and articulable suspicion to believe that defendant had committed a traffic offense,

---

[5] Judge Kazlau's opinion suggests the white rock of crack had been found in an inventory of defendant's vehicle. There is no testimony in the trial record, however, that defendant's wallet was recovered from defendant's vehicle. We note that because defendant failed to make a pretrial motion to suppress, there was no occasion to take testimony that focused on the manner in which defendant was searched incident to his arrest before he was transported to the police station.

thus justifying the field sobriety tests. The officers' suspicion that defendant had committed a DUI offense ripened into probable cause when defendant failed those tests, justifying an arrest and search incident thereto that led to the discovery of the CDS on defendant's person.

III.

We next address defendant's claim that he had been improperly targeted by police based on his race. We start by noting that defendant never raised this issue in a pretrial motion even though he seeks to suppress evidence as a result of the alleged selective enforcement. See Rule 7:5-2. We nonetheless address defendant's equal protection argument on the merits in recognition of the seminal importance of the rule that prohibits racial targeting by police.

Importantly, defendant never presented evidence to support his racial profiling claim. In State v. Segars, the Supreme Court announced a "burden shifting template" in racial targeting cases. 172 N.J. 481, 495–96 (2002). A defendant advancing a selective enforcement claim under the Fourteenth Amendment equal protection clause has the ultimate burden of proving by a preponderance of the evidence that the police acted with a discriminatory

A-3979-18

purpose.[6] Id. at 496. In addition to bearing the ultimate burden of persuasion, a defendant bears the preliminary obligation of establishing a prima facie case of discrimination, that is, one in which the evidence, including any favorable inferences that can be drawn therefrom, could sustain a judgment. Id. at 494. If a defendant establishes a prima facie case of racial targeting, a burden of production shifts to the State to articulate a race-neutral basis for the police action. Ibid. The State's burden of production under this analytical template "has been described as so light as to be 'little more than a formality.' It is met whether or not the evidence produced is found to be persuasive." Ibid. (quoting Mogull v. CB Commercial Real Estate Grp., 162 N.J. 449, 469 (2000)). However, the State cannot remain silent once a prima facie case has been established because the prima facie case in effect creates a presumption that police unlawfully discriminated. Id. at 495.

In this instance, defendant has failed to establish a prima facie case of racial targeting. Even when given the benefit of all reasonable inferences, nothing in the record before us supports defendant's speculation that Officer Knudson singled him out for suspicion based on a discriminatory purpose. But

_____

[6] We add that the prohibition against selective enforcement applies to field inquires and not just to investigative detentions, arrests, and searches. See State v. Maryland, 167 N.J. 471 (2001).

even were we to assume for purposes of argument that a burden of production shifted to the State, the record clearly establishes a race-neutral explanation: the officer was responding to the information that had been given to him by the dispatcher. It therefore is clear that the officer's encounter with defendant under the community caretaking doctrine was not "a pretext to conduct an otherwise unlawful warrantless search." State v. Bogan, 200 N.J. 61, 67 (2009). Indeed, we believe Officer Knudson would have been derelict in his duties had he not looked for a vehicle in the area matching the SUV described in the 9-1-1 call. It was appropriate under both the Fourth Amendment and the Fourteenth Amendment equal protection clause for Officer Knudson to approach defendant's SUV to investigate whether this was the vehicle in the roadway whose driver appeared to be unconscious minutes earlier.

We add that the dispatch to Officer Knudson described the occupant of the black SUV as an African American male. As we have noted, defendant disputes that the 9-1-1 caller mentioned the vehicle occupant's race. The caller testified at trial that she did not recall providing the 9-1-1 operator with a description of the occupant's race, and a transcript of the 9-1-1 call is not part of the record before us. The State also acknowledged this discrepancy. But even assuming a mistake was made either by the 9-1-1 operator or the police

17

dispatcher and there was no basis to include a racial description in the be-on-the-lookout dispatch provided to Office Knudson, we do not believe it is reasonable to infer for purposes of the burden-shifting template that either the 9-1-1 operator or dispatcher engaged in purposeful discrimination. We therefore conclude that defendant has failed to establish that he was the victim of racial targeting.

IV.

Defendant contends that his convictions must be vacated because the prosecutor never made an opening statement at the municipal court trial or at the Law Division trial de novo on the record. Defendant relies on Rule 1:7-1, which provides, "[b]efore any evidence is offered at trial, the State in a criminal action or the plaintiff in a civil action, unless otherwise provided in the pretrial order, shall make an opening statement. A defendant who chooses to make an opening statement shall do so immediately thereafter." (emphasis added). Defendant cites no authority, however, for the proposition that this Part I rule of general application requires a new trial when the prosecutor decides not to make an opening statement at a municipal court bench trial and there is no contemporaneous objection from defense counsel. Instead of objecting in a timely manner, defendant's attorney raised the issue after the State presented its

first witness: "[j]udge it just dawned on me. The prosecution I don't think you ever made an opening statement. . . . since she's never made an opening statement, I guess I'll just simply . . . move to dismiss the entire case[.]"

Looking to the purpose undergirding Rule 1:7-1, we believe it serves a significantly reduced function in the context of a municipal court bench trial, and even less function, if any, at a trial de novo on the record in the Law Division. In State v. Portock, we remarked that a prosecutor's opening statement "should be part of orderly trial procedure provided for the benefit of the jury, not the defendant." 205 N.J. Super. 499, 505 (App. Div. 1985) (emphasis added). In State v. Walden, we further explained that a prosecutor's opening statement serves to provide a roadmap of the State's case. 370 N.J. Super. 549, 558 (App. Div. 2004). As Judge Kazlau aptly noted when he rejected defendant's argument, while a lay jury requires such roadmap, judges may not. Judge Kazlau explained that judges "are trained in the intricacies of the law, which would not necessarily warrant the need for an opening statement[.]" We agree. Indeed, if either the municipal court judge or Judge Kazlau on de novo review believed that an opening statement by the prosecutor was needed to help them better understand the nature of the State's case, either or both judges presumably would have required an opening statement pursuant to Rule 1:7-1.

We add in this regard the rule explicitly recognizes that an opening statement is not required if "otherwise provided in the pretrial order." Here, there was no pretrial order. But we interpret this exemption to mean, in the context of a bench trial, that the judge sitting as trier-of-fact may dispense with an opening statement by the prosecutor.

Defendant claims on appeal that he "was unable to prepare a defense in accordance with the State's opening statement[.]" As we have noted, opening statements are for the benefit of the trier of fact, not opposing counsel. See Portock, 205 N.J. Super. at 505. We presume that defense counsel was ready for trial based on his review of discovery and other pretrial preparation. If counsel was not prepared to mount a defense at trial, it was his obligation to move for an adjournment rather than hope to learn the nature of the State's case from the prosecutor's opening statement. We therefore reject defendant's contention on appeal that his counsel was unable to prepare a defense because the prosecutor did not summarize the State's case in an opening statement.

Judge Kazlau ultimately determined that defendant suffered no prejudice. We agree and reiterate that counsel did not object contemporaneously to the State offering evidence at trial without first making an opening statement. Rather, counsel laid back and waited to object in the hope of securing a

20

dismissal.  Even if defendant objected contemporaneously, summary dismissal would not be an appropriate remedy.  At most, the prosecutor would have been instructed to make an opening statement in accordance with Rule 1:7-1.

In these circumstances, we embrace Judge Kazlau's conclusion that "[t]he fact that the State omitted making an opening statement does not warrant the [c]ourt to remand the proceedings back to the municipal court for a new trial or vacate [defendant's] conviction."  Even assuming for purposes of argument that the trial court committed error by not sua sponte ordering the prosecutor to make an opening statement under Rule 1:7-1, any such purported error was not clearly capable of producing an unjust result.  R. 2:10-2.

## V.

We next address defendant's contention that the State failed to prove the charged offenses beyond a reasonable doubt.  In view of the limited scope of our review, this contention does not require extensive discussion.  An appellate court does not review the record "from the point of view of how it would decide the matter if it were the court of first instance." State v. Johnson, 42 N.J. 146, 161 (1964).  Rather, "[t]he aim of the review at the outset is . . . to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record."  Id. at 162.  See also State v. Barone, 147 N.J.

599, 615 (1997) (holding that an appellate court is not to "weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence."). Accordingly, we defer to "those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and have the 'feel' of the case, which a reviewing court cannot enjoy." Johnson, 42 N.J. at 161. Furthermore, "the rule of deference is more compelling where . . . two lower courts have entered concurrent judgments on purely factual issues." State v. Locurto, 157 N.J. 463, 474 (1999). In following this "two-court rule," we "ordinarily should not undertake to alter concurrent findings of facts and credibility determinations made by two lower courts absent a very obvious and exceptional showing of error." Ibid.

Applying this deferential standard of review, we conclude the convictions are supported by ample evidence adduced by the State over the course of the four-day trial. We add that defendant argues the State failed to prove that he was operating the vehicle when Officer Knudson approached. Defendant contends that he was "minding his business asleep in a parking lot with the car off." In this instance, we need not rely on cases that broadly define what constitutes operation of a vehicle for purposes of the DUI statute. See, e.g., State v. Daly, 64 N.J. 122, 125 (1973) (defendant properly convicted of DUI

while sitting in his car with the engine on). Defendant admitted to Officer Knudson that he was the driver who had been stationary in the roadway minutes before the officer arrived at the parking lot in response to the 9-1-1 call. The evidence thus circumstantially—but compellingly—establishes that defendant had driven his SUV from the intersection to the parking lot. So too the evidence adduced at trial clearly proved that the small white rock found in defendant's wallet was crack cocaine. Defendant admitted to police it was cocaine, which was verified by laboratory testing.

To the extent we have not addressed them, any remaining arguments made by defendant lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION